UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SHIRLEY JOHNSON,

      Plaintiff,

v.                                       Case No: 8:18-cv-907-T-36AEP

FAMILY PRACTICE AND INJURY
CENTER, INC., and NILA ALLEN,
*individually*,

      Defendants.

_____/

## O R D E R

This cause is before the Court upon Defendants' Motion for Summary Judgment (the "Motion"). Doc. 14. Plaintiff Shirley Johnson ("Plaintiff") responded in opposition. Doc. 20. The Court, having considered the parties' submissions and being fully advised in the premises, will grant the Motion.

## I.    BACKGROUND AND FACTS

### A.  Undisputed Facts[1]

#### i.  Introduction

Family Practice and Injury Center, Inc. ("Family Practice") is a general family medical practice located in St. Petersburg, Florida and owned by Dr. Nila Allen ("Dr. Allen" and, together with Family Practice, "Defendants"). Doc. 22 ¶1. Family Practice employed Plaintiff, an African American woman, as a medical assistant from July 2016 until November 2017. *Id.* at ¶3. Since 2005, Family Practice also employed Dr. Speros George Hampilos ("Dr. Hampilos"). *Id.* at ¶4. Dr.

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations and exhibits, as well as the parties' Stipulation of Agreed Material Facts.

Hampilos serves as Family Practice's medical director physician. *Id.* Family Practice cannot operate its primary care practice without employing an M.D., D.O., or nurse practitioner on its staff. *Id.* at ¶5. During Plaintiff's employment with Family Practice, while watching the news, Dr. Hampilos commented, "If football players can stand in line for welfare checks, they can stand up for the national anthem" (the "National Anthem Comment"). *Id.* at ¶9. Dr. Hampilos made this comment in the presence of Plaintiff, but Dr. Hampilos did not direct the comment towards Plaintiff. *Id.* After filing this lawsuit, Plaintiff wished Dr. Hampilos a happy birthday via text. Doc. 14-2 at 97:3–8; Doc. 20-5 at 17:16–25, 18:1–14.

Dr. Allen, who serves as the supervisor of Family Practice's employees, is responsible for hiring, firing, and disciplining employees. Doc. 22 ¶2. Family Practice's employees, including Plaintiff, primarily communicate with Dr. Allen by text message. *Id.* at ¶9. Plaintiff and Dr. Allen exchanged numerous text messages pertaining to Plaintiff's employment. *Id.* at ¶8. The parties have produced and authenticated such text messages from a time period spanning March of 2017 to November 2, 2017. *Id.* On Mondays, Tuesdays, and Thursdays, Family Practice operates from 8:30 a.m. to 5:00 p.m. *Id.* at ¶6. Similarly, on Wednesdays and Fridays, Family Practice operates from 8:30 a.m. to 3:00 p.m. *Id.* On November 1, 2017, Plaintiff informed Dr. Allen via text message that she would be tardy for work. *Id.* at ¶10. In response, Dr. Allen advised Plaintiff that she was changing Plaintiff's hours of employment to 1:00 p.m. to closing time. *Id.* Plaintiff quit her position with Family Practice, effective on or about November 27, 2017. *Id.* at ¶11.

### ii. The Employee Handbook

Family Practice maintains an employee handbook (the "Employee Handbook"), which was obtained from its payroll provider. *Id.* at ¶12. While there are disputes regarding the applicability and interpretation of the Employee Handbook, a review of the parties' submissions reveals that

the parties do not dispute the plain language of the Employee Handbook. An employee whom Family Practice schedules to work at least thirty-two hours per week is considered a full-time employee and therefore must complete time sheets or clock-in and clock-out of work. Doc. 14-5 at 19. The Employee Handbook's "Standards of Conduct" policy provides examples of unacceptable conduct in the work environment under two categories, "Job Performance" and "Gross Misconduct," emphasizing that gross misconduct may result in immediate termination. *Id.* at 12. "Excessive absenteeism or tardiness" is listed under "Job Performance." *Id.* Following these examples, the Employee Handbook reiterates that Family Practice may terminate the employment relationship at any time and for any reason, with or without cause or prior notice. *Id.* Significantly, the Employee Handbook also contains an "Absenteeism & Tardiness" policy. *Id.* at 30. This policy provides, in relevant part:

> If you find it necessary to be absent from work, you are required to adhere to the following procedures:
>
> - First, personally contact your supervisor at least 1 hour prior to your start time with a full explanation for your absence and an estimated time for your return to work. If you are uncomfortable calling your supervisor because of a personal health problem, you may instead call Human Resources.
>
> - Unless other arrangements have been made through your supervisor, you are required to call in each day during your absence. Failure to call on any day will be considered a serious breach of this policy. You may be asked by your supervisor to submit a doctor's note to Human Resources to verify your medical condition.

*Id.*

This policy also cautions that Family Practice will abide by the following "guidelines" for hourly employees: (1) an employee who is "repeatedly tardy, and/or repeatedly absent may be subject to a verbal and/or written warning"; and (2) an employee who fails to "show immediate and significant improvement after receiving a warning" may receive additional disciplinary action

"up to and including termination of employment"; and (iii) "[a] 'no show, no call' for work, or any other serious attendance violations, may lead to immediate termination." *Id.* Relatedly, under the "Emergencies" policy, if "sever[e] weather conditions" warrant the closure of Family Practice, employees carry responsibility for maintaining contact with their supervisor. *Id.* at 28. The policy places responsibility on employees for "calling in daily for the duration of the emergency." *Id.*

The "Vacation" policy provides that all regular, full-time employees who work at least thirty-two hours per week on a "regular basis" are eligible for paid vacation after one year of employment. *Id.* at 34. Employees with "1 to 2 years of service" are entitled to one week of paid vacation. *Id.* Family Practice employees may use this vacation time in "full 8-hour days or half 4-hour days." *Id.* Further, under the "Sick Pay" policy, "[a]fter 90 days for time loss from work due to illness or injury, [Family Practice] provides 4 paid sick days per year to employees." *Id.* Family Practice requires employees to notify their immediate supervisor of their unavailability for their shift as a result of an illness or injury prior to such shift. *Id.* The supervisor must be contacted each additional day of the absence, and the supervisor may require a physician's statement from the employee if the employee is absent for three or more consecutive days. *Id.* Employees may "take" sick pay in increments of four hours or eight hours. *Id.*

Finally, pursuant to the Employee Handbook's "Policy Against Harassment, Discrimination, and Retaliation," any employee who experiences, observes, or learns of behavior that the employee believes to be "harassing or discriminatory in nature, which is inappropriate or offensive, or which makes [the employee] or others uncomfortable," must report such behavior immediately. *Id.* at 8.

### B. Disputed Facts as to Dr. Hampilos's Comments, Plaintiff's Complaint, and Plaintiff's Work Hours

During her deposition, Plaintiff identified two comments of Dr. Hampilos which upset her. Doc. 14-2 at 37:24–25; 39 at 1–4. In addition to the National Anthem Comment, provided above, Plaintiff asserts that, while watching the news on television, Dr. Hampilos referred to a judge who was "against [President] Donald Trump" as a "black bitch" (the "Judge Comment"). *Id.* at 34:25; 35:1–4. This remark made Plaintiff feel "very uncomfortable," but she did not say anything about the comment at that time. *Id.* at 34:11–17. According to Plaintiff, Dr. Hampilos was speaking to John Hoskins ("Hoskins") and Paul Notine ("Notine"), two representatives for a pharmaceutical company, who were watching television with Dr. Hampilos. *Id.* at 39:3–15. Additionally, Plaintiff claims that Dr. Hampilos used the "N" word[2] in her presence in July of 2016 while quoting Chris Rock's comedy routines. *Id.* at 36:7–20. Plaintiff contends that she did not take offense to Dr. Hampilos's use of this word because he was merely quoting Chris Rock. *Id.* at 37:6–9. She did not complain to Dr. Allen about Dr. Hampilos quoting Chris Rock, but asserts that Dr. Allen heard such remarks because she was often present. *Id.* at 37:10–15.

Dr. Hampilos denies making the Judge Comment. Docs. 20-6 at 27:2–5, 39:10–12; 14-4 ¶17. During his deposition, Dr. Hampilos claimed that, although he may have opposed a judge, race was unrelated to his opposition. Doc. 20-6 at 39:13–22. Hoskins denies that Dr. Hampilos made this comment in his presence. Doc. 14-7 ¶6. Notine similarly denies that Dr. Hampilos made this comment in his presence and further declares that he has not heard Dr. Hampilos make comments such as the Judge Comment within the ten years during which he has known Dr. Hampilos. Doc. 14-6 ¶¶7–8. Further, Dr. Hampilos denies saying the "N" word during his

---

[2] Plaintiff described the language in this manner in her deposition. Doc. 14-2 at 36:10–11. The Court will also describe the language in this manner herein.

employment with Family Practice, but admits that he has said this word before. Doc. 20-6 at 28:5–15.

A dispute also exists regarding whether Plaintiff complained regarding Dr. Hampilos's remarks. Plaintiff claims that she complained to Dr. Allen "right away" after Dr. Hampilos made the National Anthem Comment. Doc. 14-2 at 33:22–24, 34:20–22. This allegedly occurred near Halloween of 2017. *Id.* at 33:24–25, 34:1–5. Plaintiff asserts that she complained prior to Dr. Allen's reduction of her hours. *Id.* at 31:25, 32:1–3, 59:8–25. Plaintiff told Dr. Allen that the National Anthem Comment caused her to feel "very uncomfortable," that Dr. Hampilos had "gone too far," and the comment was "very offensive to [Plaintiff] and [her] race." *Id.* at 32:9–14. Dr. Allen allegedly asked what happened when Plaintiff told her about the National Anthem Comment. *Id.* at 32:14–16. Plaintiff also purportedly told Dr. Allen about the Judge Comment at this time. *Id.* at 34:23–25, 35:24–25, 36:1–3. Plaintiff expected Dr. Allen to talk to Dr. Hampilos, but Dr. Allen's alleged inquiry was "all that she said" and Plaintiff's complaint to Dr. Allen was "as far as it got." *Id.* at 45:2–10.

On the other hand, Defendants dispute that Plaintiff complained of the National Anthem Comment or the Judge Comment. Dr. Allen attests in her affidavit that Plaintiff never complained or reported to her that any Family Practice employees had made racially charged comments in the workplace. Doc. 14-1 ¶18. As such, Dr. Allen avers that Plaintiff never complained or reported the National Anthem Comment or the Judge Comment to her, either verbally or in writing, advised Dr. Allen that such comments were offensive, or that Dr. Hampilos should stop making such comments. *Id.* at ¶28. Indeed, Dr. Allen contends that she did not learn of the comments that Plaintiff attributes to Dr. Hampilos until she was served with and reviewed Plaintiff's complaint in this action. *Id.* at ¶23. Dr. Allen contends that she would have addressed any racially insensitive

comments immediately and disciplined the speaker of such comments if an employee had reported such comments. *Id.* at ¶19. Dr. Allen also testified during her deposition that Plaintiff never complained to her regarding any inappropriate comments of Dr. Hampilos. Doc. 20-4 at 97:1–3, 22–24.

The parties also dispute Family Practice's required start time for Plaintiff. According to Dr. Allen, as supervisor of Family Practice, Plaintiff's position required her to arrive to work by 8:15 a.m. on the days she was scheduled because Family Practice opens at 8:30 a.m. each weekday and needs a medical assistant to be available to attend to patients. Doc. 14-1 ¶7; Doc. 20-3 at 38: 5–6. However, Plaintiff contends that she was required to arrive for work at 8:30 a.m., and she denies that Family Practice required her to arrive fifteen minutes before 8:30 a.m. Doc. 14-2 at 27:16–22.

### C. Procedural History

Plaintiff sues Defendants for retaliation under 42 U.S.C. § 1981. Doc. 1 ¶¶17–20. Plaintiff sues Dr. Allen in her individual capacity. *Id.* at 1. Plaintiff alleges that she was subjected to Dr. Hampilos's racially-charged comments during her employment with Family Practice. *Id.* at ¶12. Plaintiff contends that she complained to Dr. Allen regarding Dr. Hampilos's comments, conveyed that the comments offended her, and stated that the comments should cease. *Id.* at ¶14. According to Plaintiff, her hours of employment were subsequently reduced, thereby resulting in a constructive discharge. *Id.* at ¶¶15–16. Plaintiff alleges that she suffered an adverse action for opposing an unlawful employment practice under 42 U.S.C. § 1981.[3] *Id.* at ¶18.

---

[3] Plaintiff's complaint alleges that she suffered an "adverse employment action" for her opposition to an unlawful employment practice under § 1981. As set forth below, the proper standard is whether Plaintiff suffered a "materially adverse action." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Defendant moves for summary judgment on Plaintiff's claims against Defendants. Doc. 14 at 2. The Court held oral argument on the Motion on September 4, 2019. Doc. 29. Prior to oral argument, the Court instructed the parties to address, *inter alia*, (1) whether Dr. Allen may be held individually liable under 42 U.S.C. § 1981; and (2) whether Plaintiff opposed an employment practice that she had a good faith, reasonable belief was unlawful and, if so, why such belief was objectively reasonable, as measured by controlling substantive law. Doc. 30. The parties addressed these issues during oral argument and, with the Court's leave, in supplemental briefing. Docs. 32, 33.

## II.     LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a

genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. But, a party cannot defeat summary judgment by relying on conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x. 852, 858 (11th Cir. 2006). Summary judgment should be granted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.   ANALYSIS

Defendants offer two arguments in the Motion: (1) the decision to reduce Plaintiff's hours was a justifiable and legitimate decision resulting from Plaintiff's absenteeism and tardiness; and (2) Plaintiff cannot establish the legitimate reasons to reduce her hours were a pre-text for retaliation. [4] Doc. 14 at 12–15. Through supplemental briefing, Defendants also argue that Dr. Allen may not be held personally liable under § 1981 and Plaintiff cannot establish that she engaged in statutorily protected activity for her *prima facie* case. For the reasons set forth below, the Motion is due to be granted because Plaintiff has failed to establish a *prima facie* case of retaliation under § 1981.

### A.  Individual Liability

A threshold consideration is whether Dr. Allen may be held individually liable under § 1981, as Plaintiff sues Dr. Allen individually. "Individual capacity suits under Title VII are . . . inappropriate," *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (per curiam), because "[r]elief granted under Title VII is against the employer, not individual employees whose actions

---

[4] Although the Court's Case Management and Scheduling Order provided Defendants with leave to file a reply, as the Court typically allows for summary judgment motions, Defendants did not file a reply. Doc. 11 at 6.

would constitute a violation of the Act," *Smith v. Lomax*, 45 F.3d 402, 403 n.4 (11th Cir. 1995).

Unlike Title VII, however, individual employees can be held liable under § 1981. *Mathis v. Cannon*, No. 6:12-cv-1535-Orl-36KRS, 2013 WL 690838, at *3 (M.D. Fla. Feb. 7, 2013), *report and recommendation adopted*, 6:12-cv-1535-Orl-36KRS, 2013 WL 687039 (M.D. Fla. Feb. 26, 2013) (Honeywell, J.) (finding that a supervisor may be held liable under 42 U.S.C. § 1981). The Eleventh Circuit has not directly addressed individual liability under § 1981, but has suggested that individual liability under § 1981 may exist as a result of interference or participation. *See Faraca v. Clements*, 506 F.2d 956, 959–60 (5th Cir. 1975)[5] (affirming judgment holding director of the Georgia Retardation Center individually liable under § 1981); *Burnstein v. Etmel, Inc.*, 137 F. App'x 205, 208 (11th Cir. 2005) (per curiam) (finding that an individual who did not participate in a decision not to offer an employment contract to the plaintiff-employee was not liable under § 1981 because he did not participate in the decision).

This Court has recognized individual liability under § 1981 and utilized the Tenth Circuit's test to analyze individual liability. Under this test, "[a] claim for individual liability under Section 1981 requires 'some affirmative link to causally connect the actor with the discriminatory action.'" *Crawley v. Paskert-Johnson Co.*, No. 8:07-cv-1789-T-23TGW, 2008 WL 4793650, at *1 (M.D. Fla. Nov. 3, 2008) (Merryday, J.) (quoting *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 983 (10th Cir. 1991), *overruled on other grounds*, *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.2d 1220, 1228 (10th Cir. 2000)). "A claim seeking personal liability under section 1981 must be predicated on the actor's personal involvement in the alleged discrimination." *Id.* (internal quotation marks omitted). "Personal involvement may be satisfied by proof that the individual had knowledge of

---

[5] In *Bonner v. City of Prichard, Alabama*, the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

the alleged acts of discrimination and failed to remedy or prevent them." *Wallace v. DM Customs, Inc.*, No. 8:05-cv-115-T-23TBM, 2006 WL 2882715, at *7 (M.D. Fla. Oct. 6, 2006) (Merryday, J.) (adopting report and recommendation).

Defendants argue that Dr. Allen may not be held personally liable because the record lacks any evidence that Dr. Allen personally was involved in any alleged racially charged comments. Doc. 32 at 2. Plaintiff counters that Dr. Allen faces individual liability under § 1981 "as the company officially who took the retaliation employment action against Plaintiff." Doc. 33 at 3. As discussed in more detail below, Plaintiff has failed to establish her *prima facie* case. As such, her § 1981 claim as to both Family Practice and Dr. Allen must fail. An analysis regarding the viability of Plaintiff's claim against Dr. Allen individually is therefore unnecessary.

### B. Plaintiff's *Prima Facie* Case

Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). The statute defines "make and enforce contracts" to "include[e] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). The United States Supreme Court has emphasized that § 1981 "offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). A plaintiff bringing a § 1981 claim "must identify injuries flowing from a racially motivated breach of [her] contractual relationship, not of someone else's." *Id.* at 479–80. Florida law demonstrates that at-will employment provides a sufficient contractual relationship for the

purpose of a § 1981 analysis. *Knight v. Palm City Millwork & Supply Co.*, 78 F. Supp. 2d 1345, 1347 (S.D. Fla. 1999); *cf. Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F. Supp. 2d 27, 32 (D.D.C. 1999) ("Whether specific state law treats at-will agreements as contracts seems to be a controlling factor in deciding whether these agreements are covered under § 1981.").

Claims of race-based retaliation may be brought under § 1981. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 446 (2008) ("The question before us is whether § 1981 encompasses retaliation claims. We conclude that it does."). A claim brought under § 1981 carries the same requirements of proof and utilizes the same analytical framework as a claim brought under Title VII. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). "[A] plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence." *Id.* "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Id.* Thus, "remarks by non-decision makers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Id.* (citing *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir. 1990)). Here, Plaintiff relies on circumstantial evidence because her argument that Defendants unlawfully retaliated against her is premised upon inferences.

When a plaintiff relies on circumstantial evidence, a court may use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Rose v. Wal-Mart Stores E., Inc.*, 631 F. App'x 796, 798 (11th Cir. 2015) (per curiam). A plaintiff accordingly establishes a *prima facie* case of retaliation under § 1981 by demonstrating that: "(1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action." *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1259 (11th Cir. 2012) (internal quotation marks omitted).

Because § 1981 is directed exclusively towards racial discrimination, Plaintiff's retaliation claim must allege discrimination due to race, but Plaintiff is not required to show that the claimed retaliation be "directly due" to Plaintiff's race. *Tucker v. Talladega City Sch.*, 171 F. App'x 289, 295–96 (11th Cir. 2006) (per curiam). Entering summary judgment is appropriate where a plaintiff fails to satisfy any of the three elements of her *prima facie* case. *Adams v. City of Montgomery*, 569 F. App'x 769, 773 (11th Cir. 2014) (per curiam) (citing *Turling v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1433 (11th Cir. 1998)).

Although the Court would typically begin its analysis of Plaintiff's *prima facie* case by examining Plaintiff's purported engagement in statutorily protected activity, the Court will instead begin with the second and third elements—whether Plaintiff suffered a materially adverse action and whether a causal connection existed between the adverse action and the protected activity— for ease of analysis. For the reasons set forth below, Plaintiff's *prima facie* case fails.

### i. Materially Adverse Action

Plaintiff must establish that she suffered a materially adverse action. Plaintiff has satisfied this element at this stage of the litigation.

"An action is materially adverse if it might have dissuaded a reasonable worker from making or support a charge of discrimination." *Chapter 7 Trustee*, 683 F.3d at 1259 (internal quotation marks omitted) (quoting *Burlington N.*, 548 U.S. at 68). "While the jury traditionally should decide whether a defendant's actions are sufficiently adverse, 'petty and trivial' actions by the defendant are not sufficiently adverse." *Rainey v. Holder*, 412 F. App'x 235, 238 (11th Cir. 2011) (per curiam) (quoting *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008)). A plaintiff may premise her retaliation claim upon an alleged constructive discharge. *See Beltrami v. Special Counsel, Inc.*, 170 F. App'x 61, 62 (11th Cir. 2006) (per curiam); *Griner v. City of Sanibel, Fla.*,

No. 2:17-cv-282-FtM-99MRM, 2017 WL 3782788, at *2 (M.D. Fla. Aug. 31, 2017) (Chappell, J.).

Plaintiff offers her constructive discharge as the materially adverse action. "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (internal quotations omitted). A reduction in an employee's hours provides sufficient evidence of an adverse action because "doing so 'could well dissuade a reasonable worker from making or supporting a charge of discrimination' especially where, as in this case, reduced hours translates to reduced wages.'" *Banks v. Ga. Dep't of Behavioral Health & Developmental Disabilities*, No. 1:15-cv-04301-ELR-JCF, 2018 WL 8838857, at *20 (N.D. Ga. May 29, 2018) (quoting *Ambus v. AutoZoners, LLC*, 71 F. Supp. 3d 1280, 1303 (M.D. Ala. 2014), *report and recommendation adopted*, 1:15-cv-04301, 2018 WL 8838793 (N.D. Ga. July 11, 2018)).

Defendants' counsel conceded during oral argument that the reduction in Plaintiff's hours constitutes a materially adverse action. As stated above, the parties dispute whether Family Practice required Plaintiff to arrive to work by 8:15 a.m. or by the 8:30 a.m. opening time. However, the parties stipulate that Family Practice is open from 8:30 a.m. to 5:00 p.m. on Mondays, Tuesdays, and Thursdays, as well as from 8:30 a.m. to 3:00 p.m. on Wednesdays and Fridays. The parties also agree that, after Plaintiff informed Dr. Allen via text message that she would be late for work on November 1, 2017, Dr. Allen informed Plaintiff that she was changing her hours of employment to 1:00 p.m. to closing time. Plaintiff testified that she could have continued to work on this reduced hourly basis only if she "wanted to be homeless." Doc. 14-2 at 58:23–25. In light of the undisputed facts, the parties' agreement that such action constitutes a materially adverse action, and the recognition that a jury should traditionally decide the sufficient

adversity of such actions, Plaintiff has satisfied her burden with respect to this element at this stage of the litigation.

### ii. Causal Connection

Plaintiff also must establish the existence of a causal connection between the materially adverse action and the statutorily protected activity. Plaintiff's satisfaction of this element is dependent upon her engagement in statutorily protected activity.

In *University of Texas Southwestern Medical Center v. Nassar*, the Supreme Court held that a plaintiff bringing a Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." 570 U.S. 338, 362 (2013). Courts within the Eleventh Circuit have applied the "but-for" causation standard articulated in *Nassar* to retaliation claims under § 1981. *See, e.g.*, *Trice v. Infinity Staffing Solutions, LLC*, No. 1:15-cv-3401-WSD-JFK, 2017 WL 9472897, at *1 (N.D. Ga. July 5, 2017), *report and recommendation adopted*, No. 1:15-cv-3401-WSD, 2017 WL 3499035 (N.D. Ga. Aug. 16, 2017); *Brown v. CRST Malone, Inc.*, No. CV-12-BE-3954-S, 2014 WL 4681363, at *19 (N.D. Ala. Sept. 17, 2014).

A plaintiff may satisfy her burden of establishing causation by showing "close temporal proximity" between the statutorily protected activity and the materially adverse action. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (per curiam); *Adams*, 569 F. App'x at 772–73 (emphasizing, post-*Nassar*, that a plaintiff may carry her burden of causation by "showing close temporal proximity between the statutorily protected activity and the adverse action")."But mere temporal proximity, without more, must be 'very close.'" *Thomas*, 605 F.3d at 1363 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)); *accord Peterson v. Bd. of Trustees of the Univ. of Ala.*, 644 F. App'x 951, 956 (11th Cir. 2016) (per curiam) (stating

that "very close temporal proximity between the protected activity and the adverse action may indicate causation"). The Eleventh Circuit has not established a bright-line rule for determining which timespans conclusively qualify as "close temporal proximity." *Brathwaite v. Sch. Bd. of Broward Cnty., Fla.*, 763 F. App'x 856, 861 (11th Cir. 2019) (per curiam). However, a three- to four-month disparity between the statutorily protected activity and the adverse action is insufficient, *Thomas*, 506 F.3d at 1364, and adverse action "within days—or at the most within two weeks—of [the plaintiff's] protected activity can be circumstantial evidence of a causal connection between the two," *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 926 (11th Cir. 2018).

Although disputed, Plaintiff alleges that she complained to Dr. Allen regarding Dr. Hampilos's racially derogatory comments near Halloween of 2017. Plaintiff claims this occurred prior to Dr. Allen's reduction of her hours. As discussed in greater detail herein, Plaintiff seeks to establish that her complaint constituted engagement in statutorily protected activity. The parties stipulate that Dr. Allen reduced Plaintiff's hours on November 1, 2017. Therefore, if Plaintiff successfully demonstrates that she engaged in statutorily protected activity when she complained to Dr. Allen regarding Dr. Hampilos's comments, Plaintiff engaged in statutorily protected activity towards the end of October of 2017 and suffered a materially adverse action on November 1, 2017. Defendant does not challenge this element of Plaintiff's *prima facie* case, aside from attacking any purported engagement in statutorily protected activity, as discussed herein.[6] Plaintiff argues that this close temporal proximity sufficiently demonstrates a causal connection between any alleged engagement in statutorily protected activity and the materially adverse action. Indeed, when

---

[6] In the concluding paragraph of the Motion, Defendants contend that Plaintiff fails to meet "the high bar of producing evidence that retaliation is the 'but for' reason that her hours were reduced." Doc. 14 at 15. However, Defendants do not directly address the causation element, but instead apparently rely on their arguments pertaining to the second and third steps of the burden-shifting framework to support this conclusory assertion.

viewing all factual inferences in the light most favorable to Plaintiff, Plaintiff claims that she complained to Dr. Allen regarding Dr. Hampilos's conduct and, within a timeframe ranging from one day to only a couple of weeks, Dr. Allen reduced Plaintiff's hours. If the Court finds that Plaintiff engaged in statutorily protected activity, the proximity between the two events is sufficient to demonstrate causation at this stage of the litigation. However, as set forth below, Plaintiff has failed to demonstrate that she engaged in statutorily protected activity.

### iii. Statutorily Protected Activity

#### 1. Applicable Law and Arguments

The Court turns to Plaintiff's alleged engagement in statutorily protected activity. "A plaintiff engages in statutorily protected activity when she opposes an employment practice that she has a good faith, reasonable basis to believe is unlawful." *Diamond v. Morris, Manning & Martin, LLP*, 457 F. App'x 844, 846 (11th Cir. 2012) (per curiam) (citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008)). Thus, the burden of establishing statutorily protected activity contains both a subjective component and an objective component. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016). For the subjective component, a plaintiff must demonstrate that she subjectively—in good faith—believed that her employer engaged in unlawful employment practices. *Butler*, 536 F.3d at 1213. In the § 1981 context, this requirement translates to demonstrating that the plaintiff "subjectively believe[d] that the unlawful employment practice complained of was racial discrimination." *Bell v. City of Auburn, Ala.*, 722 F. App'x 898, 900 (11th Cir. 2018) (per curiam). For the objective component, the plaintiff must demonstrate that her belief was "objectively reasonable in light of the facts and record presented." *Butler*, 536 F.3d at 1213 (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). The objective reasonableness of the belief is measured by reference to

controlling substantive law. *Furcron*, 843 F.3d at 1311. The plaintiff is not required to prove that the alleged discriminatory conduct was actually unlawful, as such opposed conduct need only be "close enough" to support the objectively reasonable belief. *Id.*

Therefore, for Plaintiff to establish the first element of her *prima facie* case of retaliation under § 1981, she must demonstrate that she opposed an employment practice of which she held a good faith, reasonable basis to believe was unlawful. Given Plaintiff's § 1981 claim, the unlawful employment practice must be racial discrimination. As previously mentioned, Defendants do not attack Plaintiff's *prima facie* case in the Motion, but Defendants argue in their supplemental briefing that, even if the Court finds that Plaintiff subjectively believed that Family Practice engaged in an unlawful employment practice, Plaintiff's belief was not objectively reasonable as measured by controlling substantive law. Doc. 32 at 4–5. Defendants specifically contend that Plaintiff cannot demonstrate that Dr. Hampilos's two comments "equate to the unlawful employment practice of creating a hostile work environment" and cite several Eleventh Circuit cases addressing purportedly hostile work environments *Id.* at 3–5. In her response to the Motion, Plaintiff highlights the absence of Plaintiff's challenge to the *prima facie* case and, without specifically addressing either the subjective component or the objective component, asserts that Plaintiff engaged in statutorily protected activity because she complained to Dr. Allen about Dr. Hampilos's comments. Doc. 20 at 10–11. In her supplemental briefing, Plaintiff attacks the applicability of the cases cited by Defendants in their supplemental briefing. Doc. 33 at 3–7.

## 2. Subjective Belief

To demonstrate that she engaged in statutorily protected activity, Plaintiff alleges that she complained to Dr. Allen regarding the National Anthem Comment, the Judge Comment, and her offense to both comments. Plaintiff testified that, although she did not report the Judge Comment

when Dr. Hampilos allegedly said it, the derogatory remark made her feel "very uncomfortable." Doc.14-2 at 34:11–17. Plaintiff similarly testified during her deposition that she reported the National Anthem Comment to Dr. Allen as "very uncomfortable" and "very offensive." *Id.* at 32:9–14. As previously discussed, whether Plaintiff complained to Dr. Allen is disputed. The Employee Handbook's "Policy Against Harassment, Discrimination, and Retaliation" requires any employee who experiences, observes, or learns of behavior that the employee believes to be "harassing or discriminatory in nature, which is inappropriate or offensive, or which makes [the employee] or others uncomfortable," to report such behavior immediately. Doc. 14-5 at 8. While Plaintiff acknowledged receiving the Employee Handbook and the existence of the policy, there is no indication that she reported Dr. Hampilos's remarks pursuant to this policy. Doc. 14-2 at 28:19–25, 29:1–2, 30: 10–18. Additionally, both Plaintiff and Dr. Hampilos testified that Plaintiff wished him happy birthday via text message after the initiation of this lawsuit. Plaintiff's decision to wish to the person whom she claims made racially derogatory comments a happy birthday undercuts her attempt to establish a good faith belief that Defendants engaged in an unlawful employment practice by virtue of Dr. Hampilos's comments. Nonetheless, as Plaintiff is the nonmoving party, the Court presumes for purposes of this analysis that Plaintiff subjectively—in good faith— believed that Defendants engaged in racial discrimination by virtue of Dr. Hampilos's comments.

### 3. Reasonableness of Belief

Even assuming that Plaintiff subjectively believed that Defendants engaged in an unlawful employment practice, her belief must be measured against controlling substantive law to determine its reasonableness. Indeed, "[w]here binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of this Court or of the

Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable." *Butler*, 536 F.3d at 1214.

Here, Plaintiff fails to demonstrate that her belief was objectively reasonable. Preliminarily, the Court notes that Plaintiff did not affirmatively plead a hostile work environment claim against Defendants. Rather, to establish an unlawful employment practice, Plaintiff implicitly argues that Dr. Hampilos's comments equate to racial discrimination, which Plaintiff allegedly opposed when she complained to Dr. Allen, by producing a hostile work environment. As such, during oral argument, Defendants' counsel cited to cases involving hostile work environments. Likewise, Plaintiff's counsel also discussed Dr. Hampilos's comments in the context of a hostile work environment and cited hostile work environment cases from the Eleventh Circuit. The supplemental briefing of both parties relies on cases involving hostile work environments. Significantly, "not every discriminatory comment made by a coworker constitutes an unlawful employment practice." *Laincy v. Chatham Cnty. Bd. of Assessors*, 520 F. App'x 780, 782 (11th Cir. 2013) (per curiam) (citing *Butler*, 536 F.3d at 1214). In a survey of binding precedent, this Court previously highlighted that an "isolated racist remark does not equate to the unlawful employment practice of creating a hostile work environment." *Smith v. Bottling Grp., LLC*, No. 8:16-cv-771-T-24MAP, 2016 WL 2944070, at *3 (M.D. Fla. May 20, 2016) (Bucklew, J.).

In *Butler v. Alabama Department of Transportation*, the plaintiff-employee's Caucasian co-worker said the "N" word twice in the plaintiff's presence after their vehicle collided with another vehicle while the two Alabama Department of Transportation employees were on their lunch break. 536 F.3d at 1210. The plaintiff, an African American woman, found this language offensive, but did not believe that the co-worker's words were directed towards her. *Id.* Later that

day, the plaintiff attempted to inform her immediate supervisor regarding the co-worker's use of the racial remarks, but her supervisor interrupted her and instructed her to stop speaking. *Id.* at 1210–11. The plaintiff informed the supervisor of the remarks three months later. *Id.* In her subsequent lawsuit, which included a retaliation claim under § 1981, the plaintiff alleged that she was retaliated against for reporting the co-worker's comments and constructively discharged. *Id.* at 1211–12.

The Eleventh Circuit found the plaintiff's § 1981 retaliation claim to be insufficient because the plaintiff did not possess an objectively reasonable belief for the purpose of demonstrating that she engaged in statutorily protected activity. *Id.* at 1213. In examining the reasonableness of the plaintiff's belief, the court cautioned that "[n]ot every uncalled for, ugly, racist statement by a co-worker is an unlawful employment practice." *Id.* In addition to recognizing that the incident occurred away from work and the hearing of any supervisors, the court highlighted the plaintiff's admission that she did not believe the slurs were directed towards her. *Id.* The court further stressed that the plaintiff had failed to "even sugges[t] that this one-time use of vile language away from work created a hostile work environment." *Id.* Indeed, the case was "nowhere near enough to create a racially hostile work environment" and the plaintiff's belief that her co-worker's use of racially discriminatory language on one occasion away from the workplace constituted a hostile work environment was simply "objectively unreasonable." *Id.* at 1214. The court concluded by reiterating, "[A] racially derogatory remark by a co-worker, without more, does not constitute an unlawful employment practice under [Title VII's retaliation provision], and opposition to such a remark, consequently, is not statutorily protected conduct." *Id.* (quoting *Little*, 103 F.3d at 961).

Beginning with the Judge Comment, Plaintiff asserts that Dr. Hampilos made the Judge Comment in approximately September of 2017. Doc. 14-2 at 38:14–17. Although the Judge Comment made Plaintiff feel "very uncomfortable," she allegedly did not report the remark to Dr. Allen until immediately after Dr. Hampilos made the National Anthem Comment, which was near Halloween of 2017. Thus, presuming Plaintiff reported the Judge Comment, she did not do so for several weeks. According to Plaintiff, Dr. Hampilos made the Judge Comment while watching television, he was speaking to Hoskins and Notine as the men watched television, and he did not direct the remark towards Plaintiff.

Plaintiff next asserts that Dr. Hampilos made the National Anthem Comment near Halloween of 2017. As to the content of the National Anthem Comment, the parties stipulate that Dr. Hampilos said, "If football players can stand in line for welfare checks, they can stand up for the national anthem." Doc. 22 ¶9. The parties also stipulate that Dr. Hampilos made this comment in Plaintiff's presence, but he did not direct the comment to her. *Id.* Plaintiff characterizes this statement as "criticizing African American NFL players kneeling for the national anthem even though African Americans and Hispanics stood in line for welfare checks," but this characterization differs significantly from the stipulated statement. Doc. 33 at 3. Further, Hampilos was questioned extensively regarding the National Anthem Comment during his deposition:

> Q.  – who were you referring to?
>
> A.  Generally, people.
>
> Q.  African Americans?
>
> A.  No, sir. No, sir. Because if you look at the population that's receiving welfare, it's almost equal between African American and Latino.
>
> Q.  Okay. So we're referring to African Americans and Latinos?

A. And everybody else that stands in line for the welfare check, sir. It has nothing to do with race.

Q. But who was kneeling for the national anthem in the NFL?

A. White and African Americans.

Q. What White players were kneeling for the national anthem?

A. I cannot recall, sir. But I know it was an issue.

. . .

Q. And then [sic] kneeling during the national anthem, that was started by an African American football player?

A. To my knowledge. Yes, sir.

Q. And by and large, it was African American football players kneeling and joining him?

A. Both white and black, sir.

Doc. 20-6 at 25:8–25, 26:1–2, 17–23.

Thus, Dr. Hampilos claimed that he was referring to "African Americans and Latinos" and "everybody else" who receives welfare.[7] Dr. Hampilos insisted that he made the National Anthem

---

[7] Plaintiff argues that the Court should strike Dr. Hampilos's affidavit, offered in support of the Motion, as a sham affidavit because he claims that he does not have any recollection of "making the specific statement," yet recalls speaking generally against NFL players kneeling before games. Doc. 20 at 5 n.5. Under the "sham affidavit" rule, a court may disregard an affidavit "if its conflict with other evidence in the case is so pronounced that the affidavit rises to the level of a sham." *Poitevint v. United Recovery Sys., L.P.*, 899 F. Supp. 2d 1230, 1235 (N.D. Fla. 2012). "An affidavit should be disregarded as a sham only "'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'" *Id.* (alterations in original) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953–54 (11th Cir. 1986)); *see Cableview Commc'ns of Jacksonville, Inc. v. Time Warner Cable Se., LLC*, No. 3:13-cv-306-J-34JRK, at *4 (M.D. Fla. Jan. 12, 2016) (Howard, J.) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987) (stating the rule "should be applied 'sparingly because of the harsh effect [it] may have on a party's case.'")). In his affidavit, Dr. Hampilos states that he has "no recollection of making the specific statement" of which Plaintiff complains in her *interrogatory response*—namely, that Dr. Hampilos stated, "[T]hey won't stand for the anthem, but they can sure stand in the welfare line." Doc. 14-4 ¶¶18, 19. (internal quotation marks omitted). Dr. Hampilos also avers that he recalls "speaking generally

Comment "in the context of another conversation," but, when pressed to explain the connection between standing for the national anthem and standing in line for welfare checks, stated that he could not remember the context of the other conversation. *Id.* at 24:9–10, 26:3–8. He believes that kneeling for the national anthem is a "poor platform" for players to use "to vocalize their dissatisfaction with the police" because he was taught to "stand for the pledge of allegiance and stand for the national anthem out of respect for the liberty that was given to us by our forefathers." *Id.* at 22:17–21, 23:1–4.

The Court presumes for purposes of this analysis that Dr. Hampilos made both the Judge Comment and the National Anthem Comment. As emphasized above, *Butler* held that an isolated, racist remark, without more, does not constitute a hostile work environment. This principle applies regardless of whether Dr. Hampilos, as the doctor on staff at Family Practice, served as Plaintiff's co-worker or supervisor. *See McCann v. Tillman*, 526 F.3d 1370, 1378–79 (11th Cir. 2008) (finding that a supervisor's racially derogatory remarks to the plaintiff were insufficient to create a racially hostile work environment). Unlike *Butler*, Plaintiff alleges that Dr. Hampilos made each comment at the place of employment—and, according to Plaintiff, possibly within earshot of Dr. Allen—rather than away from work. The Court is also cognizant that, unlike *Butler*, the focus is on two comments over the course of approximately one month, rather than two comments in one

---

against NFL players kneeling before games." *Id.* at ¶19. During his deposition, Dr. Hampilos clarified that he said, "[T]hey can stand in line for welfare checks, they can stand up for the national anthem." Doc. 20-6 at 24:1–9. The statement in Plaintiff's interrogatory response is thus distinct from Dr. Hampilos's proffered statement during his deposition, as well as the statement stipulated to by the parties. Despite the distinction, any perceived conflict is not sufficiently pronounced to declare the affidavit to be a sham. Dr. Hampilos simply states in the affidavit that he does not recall stating the quoted statement from the interrogatory response. Further, the Court does not construe Dr. Hampilos's failure to recollect the quoted statement from the interrogatory response as an attempt to create a genuine issue of material fact. Therefore, Plaintiff's request for the Court to strike Dr. Hampilos's affidavit as a sham affidavit for this reason is unavailing.

day. Nonetheless, the record lacks further alleged discrimination, whether through statements or conduct, to demonstrate the presence of a hostile work environment. Instead, these two remarks are offered together to demonstrate an allegedly hostile work environment.[8] The Judge Comment undoubtedly falls under the umbrella of an "an uncalled for, ugly racist statement." *Butler*, 536 F.3d at 1213. The meaning of the National Anthem Comment is less obvious, though. Dr. Hampilos clearly objected to professional football players kneeling for the National Anthem to protest police brutality. The comment draws an amorphous connection between professional football players and welfare recipients. Whether that connection is based on race is unclear. Indeed, as stipulated, Dr. Hampilos did not refer to any specific race or ethnicity. The Court is required at this stage of the litigation to view all factual inferences in favor of Plaintiff as the nonmoving party. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Viewing all factual inferences in favor of Plaintiff results in the Court construing this comment as carrying racist undertones against people of a race different than that of Dr. Hampilos—in other words, non-Caucasian professional football players.

These comments collectively fail to produce an unlawful employment practice by virtue of racial discrimination in the form of a hostile work environment. A workplace constitutes a hostile work environment where a plaintiff demonstrates that "the workplace is permeated with

---

[8] Plaintiff's reliance on Dr. Hampilos's disputed use of the "N" word in quoting Chris Rock's comedy routines to demonstrate an unlawful employment practice is also unavailing, given that Plaintiff testified during her deposition that she did not take offense to these remarks or otherwise believe that Dr. Hampilos was trying to discriminate against her. Doc. 14-2 at 36:11–25, 37:1–9. She also testified that Dr. Hampilos did not use this language in a derogatory way towards her. *Id.* at 49:1–2. Additionally, Plaintiff identified only the Judge Comment and the National Anthem Comment as the comments which upset her. *Id.* at 37:24–25, 38:1–4. These recognitions undercut any argument that the purported use of the "N" word contributed to or played a role in any employment practice which Plaintiff reasonably believe in good faith was unlawful.

discriminatory intimidation, ridicule, and insult" sufficiently severe or pervasive to alter the employee's employment conditions and produce an abusive working environment. *Butler*, 536 F.3d at 1214 (internal quotation marks omitted) (quoting *Rojas v. Florida*, 285 F.3d 1399, 1344 (11th Cir. 2002) (per curiam)); *see also Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1195 (11th Cir. 2016) ("To prove a *prima facie* case of hostile work environment, a plaintiff must establish that: (1) he or she belonged to a protected group, (2) he or she was subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his or her employment and create an abusive working environment, and (5) a basis exists for holding the employer liable."). The "severe or pervasive" requirement contains a subjective component and an objective component. *Gowski v. Peake*, 682 F.2d 1299, 1312 (11th Cir. 2012). In evaluating the latter, courts examine the "totality of the circumstances," which involves considering "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.*

Even when drawing all factual inferences in favor of Plaintiff, these comments did not render Family Practice a workplace "*permeated* with discriminatory intimidation, ridicule, and insult" sufficiently severe and pervasive to alter Plaintiff's employment conditions and produce an abusive working environment. *Butler*, 536 F.3d at 1214 (internal quotation marks omitted) (emphasis added). Plaintiff worked for Family Practice from July of 2016 until November of 2017. Plaintiff cites to only two racially derogatory comments within this sixteen-month timeframe. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1176 (11th Cir. 2002) (stating that "'repeated incidents of verbal harassment that continue despite the employee's objections'" are indicative of

the sufficient frequency for a hostile work environment). Neither comment was directed towards Plaintiff, as an African American woman, and Plaintiff simply overheard both comments.[9] The lack of physically threatening or humiliating conduct further undermines the reasonableness of Plaintiff's belief that Dr. Hampilos's comments produced a racially hostile work environment for purposes of racial discrimination. These comments were unaccompanied by physical threats, humiliating conduct, or even any physical harm. Rather, Dr. Hampilos's comments are more

---

[9] Citing to *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798 (11th Cir. 2010), Plaintiff claims that this lack of direct comments is "inconsequential." Doc. 33 at 6. In *Reeves*, the plaintiff was the only female employee in an open area of cubicles. *Reeves*, 594 F.3d at 803. Given the open nature of this work environment, the plaintiff could hear the language of her male coworkers as they interacted with each other and spoke on the phone. *Id.* The plaintiff's co-workers and supervisor often used derogatory terms to refer to women, such as "bitch," "crack whore," and "fucking whore," and "cunt." *Id.* at 804. Further, the plaintiff's co-workers tuned the office radio to a crude morning show every day, which featured "regular discussions of women's anatomy, a graphic discussion of how women's nipples harden in the cold, and conversations about the size of women's breasts." *Id.* Co-workers regularly sang songs about gender-derogatory topics, and one co-worker displayed a pornographic image of a naked woman with her legs spread on his computer screen. *Id.* The plaintiff specifically emphasized that this offensive conduct occurred "on a daily basis." *Id.* (internal quotation marks omitted). Indeed, in analyzing the plaintiff's subsequent hostile work environment claim, the court described the case as one "where both gender-specific and general, indiscriminate vulgarity allegedly *pervaded* the workplace." *Id.* at 809 (emphasis added). The court emphasized that "words and conduct that are sufficiently gender-specific and either severe or pervasive may state a claim of hostile work environment, *even if* the words are not directed specifically at the plaintiff." *Id.* at 811 (emphasis added). While evaluating the plaintiff's hostile work environment claim, the court explained that the abuse "constituted *repeated* and intentional discrimination directed at women as a group, if not [the plaintiff] specifically." *Id.* at 812 (emphasis added). Further, in the context of explaining that it was not "fatal" that the plaintiff's co-workers never directly called her any derogatory terms, the court highlighted, once again, that the offensive conduct occurred daily and the manager tolerated and accepted this behavior. *Id.* Thus, the *Reeves* court explained that the lack of any derogatory comments to the plaintiff was not "fatal," as Plaintiff's claim was supported by sufficient offensive conduct. The Court recognizes that a plaintiff may experience a hostile work environment even if she is not the target of the offensive conduct. *Reeves* demonstrates that the analysis regarding direct comments is not "inconsequential," but instead linked to the racial nature and the severity or pervasiveness of the conduct or words. *Reeves* is distinguishable from the instant action in such analysis, as *Reeves* involved a multitude of gender-specific derogatory remarks that pervaded the workplace and occurred daily. Further, as discussed herein, the allegedly unlawful employment practice simply involves two comments.

characteristic of mere offensive utterances. Although she alleges that she complained to Dr. Allen following the National Anthem Comment, Plaintiff fails to explain any unreasonable interference with her job performance as a result or alteration of the terms and conditions of her employment as a result of Dr. Hampilos's racially derogatory statements. For example, Plaintiff does not address any purported effect of the Judge Comment on her employment. Instead, Plaintiff merely avers that the Judge Comment offended her, and she did not report it until Dr. Hampilos made the National Anthem Comment. These two comments, while inappropriate, insensitive, and derogatory, simply are a far cry from establishing racial discrimination by way of a hostile work environment.

The Court is mindful that the conduct need not actually constitute an unlawful employment practice, but instead the opposed conduct must be "close enough" to support an objectively reasonable belief. *Furcron*, 843 F.3d at 1311. Neither the Supreme Court nor the Eleventh Circuit has clarified this "close enough" standard. In *Clover v. Total System Services, Inc.*, the Eleventh Circuit first articulated the "close enough" standard. 176 F.3d 1346, 1351 (11th Cir. 1999). The Eleventh Circuit recently reiterated this standard in *Furcron v. Mailer Centers Plus, LLC*, where the plaintiff-employer sued the defendant-employer for sexual harassment and retaliation under Title VII. 843 F.3d at 1299. In *Furcron*, the plaintiff worked alongside Seligman, a co-worker who suffered from Asperger's syndrome. During the six days in which the two employees worked together, Seligman frequently entered the plaintiff's work area and "invaded her private space." *Id.* at 1300. During other times, Seligman stared at the plaintiff from afar. *Id.* Seligman also attempted to look down the plaintiff's shirt and at her underwear when she bent over. *Id.* The plaintiff also noticed that, on a daily basis, Seligman exhibited an erect penis while staring at the plaintiff. *Id.* Significantly, the plaintiff claimed that Seligman would "deliberately bump and rub

his erection against her." *Id.* The plaintiff allegedly made her concerns known to Seligman and, after the behavior continued, told her supervisors, who took no action. *Id.* at 1301. The plaintiff thereafter took a picture of Seligman's erection to "support her claim." *Id.* She also continued to complain, including sending an e-mail to human resources in which she stated that she feared for her safety and she felt "very uncomfortable." The plaintiff was subsequently suspended for taking the photograph. *Id.*

In examining the plaintiff's *prima facie* case of retaliation, the court held that the opposed conduct was "close enough" to support an objectively reasonable belief that it was unlawful. *Id.* at 1312. Specifically, in emphasizing that Seligman returned to the plaintiff's work area "like a magnet," stood within a foot of her while working, stared at her on a daily basis, her complaint to her manager that Seligman "was deliberately rubbing against her," which she found offensive, her photograph of Seligman's erection in the context of her complaint that she was afraid to bend over and lift up materials, and a senior operations manager's admission that the conduct qualified as a "serious incident," the court found that "the nature and severity of the conduct complained of, as well as the content of the complaints themselves, are 'close enough to support an objectively reasonable belief' that the conduct opposed constituted sexual harassment." *Id.*

One sister court in this Circuit has attempted to define the "close enough" standard. In *Taylor v. Cardiovascular Specialists, P.C.*, the United States District Court for the Northern District of Georgia recognized:

> [W]hen is the opposed conduct "close enough" to discrimination "to support an objectively reasonable belief that it is"? If the circuit has provided a simple answer, neither the magistrate judge, the parties, nor the Court has found it.
>
> The circuit, however, has made clear that when the offensive conduct cannot reasonably constitute discrimination (i.e., when it is contrary to circuit precedent or is not "anywhere near" sufficient), opposing that conduct does not constitute protected activity. Put

simply, subjectively offensive conduct falls along a spectrum. At one end is conduct that is nowhere near sufficient, so no reasonable person could believe it is discrimination. At the other end is conduct that as a matter of law is discrimination, so every reasonable person would believe it is discrimination. Between these poles is conduct that a reasonable person could, but is not required to, believe is discrimination. This strongly implies that offensive conduct is "close enough" to justify a reasonable belief so long as it *could* (even if it likely would not) persuade a reasonable jury.

4 F. Supp. 3d 1374, 1379–80 (N.D. Ga. 2014) (internal citations and footnotes omitted).

The court explained that interpreting the "close enough" standard in this manner recognizes that the purposes of the anti-retaliation and anti-discrimination provisions are different, avoids placing an onerous burden on the plaintiff's *prima facie* case, and prevents the court from engaging in an arbitrary evaluation of the likelihood of success of the underlying claim. *Id.* at 1380. Of course, this Court is not bound by the *Taylor* court's interpretation of the "close enough" standard. Nonetheless, the Court views the case as persuasive. As such, the Court applies this interpretation to the instant action.

In applying this rule, the *Taylor* court found that the plaintiff's subjective belief that she worked in a hostile work environment was reasonable and therefore she engaged in statutorily protected activity. *Id.* at 1381. In *Taylor*, the plaintiff worked at Cardiovascular Specialists ("CVS") with a co-worker named Rodney Bishop ("Bishop"). *Taylor v. Cardiovascular Specialists, P.C.*, No. 1:11-cv-4521-TCB-RGV, 2013 WL 12310269, at *2 (N.D. Ga. Dec. 11, 2013), *report and recommendation adopted*, 4 F. Supp. 3d 1374 (N.D. Ga. 2014). When the plaintiff began working at CVS, her supervisor warned her that Bishop was a "womanizer," a "boob man," a "chauvinist," as well as a "pervert." *Id.* at *3 (internal quotation marks omitted). Bishop watched pornography at his computer in the plaintiff's presence," which the plaintiff found shocking, offensive, embarrassing, and invasive. *Id.* Bishop often used sexually derogatory language to describe female physicians in the presence of a coworker, such as "muff," "carpet

muncher," and "slut." *Id.* at *4. Bishop would brush up against the plaintiff as he attempted to get

by her, prompting the plaintiff to "suck in" to avoid Bishop coming into contact with her breasts.

*Id.* Bishop also "squeezed by" the plaintiff on one occasion and "rubbed up against her butt" while

she was bending over to put food on her plate, at which point Bishop's "front was on her butt" and

Bishop "did a little dance." *Id.* (internal quotations omitted). The plaintiff complained about

Bishop's conduct numerous times during the years when she worked for CVS. *Id.* When the

plaintiff discovered in July of 2010 that Bishop was a registered sex offender, she brought the

information to her supervisor. *Id.* at *6. The supervisor admitted that she knew that Bishop was a

registered sex offender and asked the plaintiff not to tell anybody because some of the doctors did

not know. *Id.* at *7. The plaintiff filed a formal complaint with CVS regarding Bishop's

inappropriate conduct and thereafter was terminated. *Id.* at *8-9.

The court held that the plaintiff's subjective belief was reasonable. 4 F. Supp. 3d at 1381.

The court found:

> [W]hen the offensive conduct is viewed cumulatively, in light of
> [the supervisor's] alleged inaction, and filtered through the fact that
> Bishop still had his job despite numerous complaints about his
> behavior (from [the plaintiff] and others) as well as CVS's
> knowledge that he was on the Georgia sex-offender registry for
> conduct involving a minor, a reasonable person could believe that
> the complained-of conduct created a hostile work environment.

*Id.*[10]

---

[10] By way of another example, in *Gilley v. Kelly & Picerne, Inc.*, the plaintiff's new supervisor initiated unwanted sexual advances towards the plaintiff within one week of her hire, such as telling the plaintiff to come over to her house because her fiancé was out of town. No. 1:14cv124-SRW, 2016 WL 814885, at *2 (M.D. Ala. Feb. 29, 2016). Over the course of approximately one month, the new supervisor flirted with the plaintiff, invited him over to her house at least four or five times, and told the plaintiff that he looked attractive. *Id.* The plaintiff told the supervisor to cease this conduct. *Id.* Within this one month time-frame, the supervisor sent several text messages to the plaintiff, which: (1) advised him that her office door was shut, but the clubhouse was open, as an upcoming meeting was expected to last two hours; (2) asked the plaintiff if he wanted to "come hit pipe" for five minutes; and (3) told the plaintiff he looked attractive. *Id.* at *3. The

Even if the interpretation articulated in *Taylor* is the proper interpretation, the facts of this case do not present a situation in which a reasonable person could believe that Dr. Hampilos' two comments constituted racial discrimination. The allegedly unlawful employment practice in each of these cases was more severe than Dr. Hampilos's comments, as both *Furcron* and *Taylor* involved unwanted physical contact. Further, the pervasiveness of the allegedly unlawful employment practice was greater in each case, compared here to two comments within approximately one month of each other over the course of approximately sixteen months of employment. While the *prima facie* burden is not intended to be onerous, the opposed conduct still must be "close enough" to support Plaintiff's objectively reasonable belief, which is measured against controlling substantive law. Certainly, when viewing factual inferences in the light most favorable to Plaintiff, Dr. Hampilos's comments were racially derogatory. But this alone will not satisfy the "close enough" standard. Significantly, "[§ 1981] is not a civility code." *Elite Amenities, Inc. v. Julington Creek Plantation Cmty. Dev. Dist.*, 784 F. App'x 750, 755 (11th Cir. 2019) (per curiam) (alteration in original).

Plaintiff also relies on *Howell v. Correctional Medical Services*, 612 F. App'x 590 (11th Cir. 2015) (per curiam), to rebut Defendants' contention that Dr. Hampilos's comments fail to

---

plaintiff interpreted this conduct as an unwanted sexual advance. *Id.* The plaintiff reported the conduct to management and thereafter filed a lawsuit, alleging that he was subjected to sexual harassment, discrimination, and retaliation. *Id.* at *1, 4–5. In analyzing whether the opposed conduct was "close enough" to support an objectively reasonable belief, the *Gilley* court cited the *Taylor* interpretation favorably. *Id.* at *11. The court held that the plaintiff satisfied the "close enough standard" under *Taylor*, emphasizing that "the conduct alleged over the course of 19 days consisted of invitations to come over to the [the supervisor's] home; comments that [the plaintiff] looked attractive; several text messages sent within minutes, on one day, outside of the employee's presence, telling [the plaintiff] that he looked 'Hott'; and an invitation to engage in sex." *Id.* at *13. The court also highlighted that the evidence that both the plaintiff and his employer considered the supervisor's comments to constitute sexual harassment was "particularly pertinent to the objective reasonableness." *Id.*

constitute an unlawful employment practice.[11] Doc. 33 at 5–6. In *Howell*, the plaintiff-employee

sued the defendant-employer under Title VII and § 1981, arguing that the defendant discriminated

against her by subjecting her to a racially-hostile work environment and retaliated against her after

she complained about such discrimination. 612 F. App'x at 591. The plaintiff, who was Caucasian,

alleged that three African American supervisees and the African American director of nursing

created a racially hostile work environment. *Howell v. Corizon, Inc.*, No. 12-0272-WS-N, 2013

WL 6068346, at *2 (S.D. Ala. Nov. 18, 2013), *aff'd in part, rev'd in part sub nom. Howell v.*

*Correctional Med. Servs.*, 612 F. App'x 590 (11th Cir. 2015). The plaintiff had testified that, prior

to the final eighteen months of her employment, she heard her supervisees refer to white inmates

and white nurses by using racially derogatory terms, such as "cracker," "old white bastards," and

"fucking white punks." *Id.* The plaintiff also identified three "racially-tinged" comments during

the final eighteen months of her employment: (1) when the director of nursing asked a correctional

officer, within the plaintiff's presence, whether the officer "want[ed] to ride the white pony"; (2)

the director's reference to the plaintiff as a "cracker," within the plaintiff's hearing, after the

director saw the plaintiff's write-ups on the supervisees; and (3) a statement by one of the

supervisees to the plaintiff that she wished they had an African American supervisor. *Id.* Also

within the final eighteen months of her employment, the director shoved a medical cart into the

plaintiff. *Id.* The district court considered only the conduct occurring within the final eighteen

months of the plaintiff's employment, as the plaintiff did not perceive the work environment as

---

[11] As previously mentioned, this Court must measure the reasonableness of Plaintiff's belief against binding precedent. Unpublished opinions are not considered binding precedent, but may be cited as persuasive authority. 11th Cir. R. 36-2. Plaintiff also relies on *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015) (en banc), in addressing the reasonableness of Plaintiff's belief. Doc. 33 at 5. As a case from outside the Eleventh Circuit, *Boyer-Liberto* is not binding upon this Court.

objectively hostile prior to that time, and excluded from consideration the supervisee's statement because it did not reflect "intimidation, ridicule, or insult." *Id.* at *3–4.

The Eleventh Circuit affirmed the district court's judgment in favor of the defendant on the plaintiff's discrimination claim, but reversed as to the retaliation claim. *Howell*, 612 F. App'x at 591. In evaluating whether the plaintiff engaged in statutorily protected activity, the court reiterated that, although the plaintiff was not required to prove that the underlying conduct of which she complained actually violated Title VII or § 1981 to demonstrate that she engaged in statutorily protected activity, she was nonetheless required to demonstrate that she believed in good faith that the conduct violated the law and such belief was objectively reasonable in light of the facts and the law. *Id.* In holding that the plaintiff's belief was objectively reasonable, the court characterized its decision as a "close call." *Id.* The court explained:

> Even though [the] [p]laintiff failed to support her hostile work environment claim with evidence of severe or pervasive harassment, the various workplace incidents, *particularly* the racially-tinged comments taken *in tandem* with the medicine cart incident, were sufficient to render objectively reasonable [the] [p]laintiff's good faith belief that she was opposing an unlawful employment practice.

*Id.* (emphasis added).

Thus, in holding that the plaintiff's belief was objectively reasonable, the Eleventh Circuit gave special weight to the two comments in conjunction with the medicine cart incident. Plaintiff argues that her claims in the instant action "parallel or exceed the claims" alleged in *Howell*. Not so. Unlike *Howell*, where the director made a racially derogatory remark about the plaintiff, neither of Dr. Hampilos's comments concerned Plaintiff. Additionally, unlike *Howell*, where the director pushed a medical cart into the plaintiff, the instant action lacks such physical conduct against Plaintiff. *Howell*, in which the Eleventh Circuit found that the plaintiff had an objectively reasonably belief by a "close call," is therefore distinguishable.

Finally, Plaintiff argues that perceiving a scenario in which Plaintiff's complaints are not protected is difficult because Supreme Court precedent dictates that the opposition clause of Title VII extends protection even to those employees who do not directly complain of harassment. Doc. 33 at 6. In *Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee,* a human resources officer of respondent asked the petitioner whether she had witnessed another employee engage in any inappropriate behavior. 555 U.S. 271, 274 (2009). The petitioner described several instances of the employee's sexual harassing behavior and the respondent subsequently fired the petitioner. *Id.* In granting summary judgment in favor of the respondent, the district court found that the petitioner failed to satisfy the opposition clause of Title VII because she had merely answered questions by investigators in a pending investigation, rather than initiating or instigating a complaint. *Id.* at 275. The Sixth Circuit affirmed. *Id.* However, the Supreme Court reversed, holding that the petitioner had "opposed" an unlawful employment practice under the opposition clause by answering the human resources personnel's questions. *Id.* at 280. The Supreme Court examined the ordinary meaning of the undefined "opposed" term in the statute and concluded that the petitioner's conduct met such definition. *Id.* at 277–78.

Plaintiff's citation to *Crawford* in support of her argument is unavailing because the case merely addresses whether a plaintiff opposes an unlawful employment practice under the opposition clause of Title VII. Indeed, the opinion centers on the definition of "opposed" under opposition clause. *Crawford* does not address the reasonableness of a plaintiff's belief in opposing an unlawful employment practice. Since *Butler* and *Crawford*, the Eleventh Circuit has reiterated that a plaintiff engages in statutorily protected activity for a § 1981 or Title VII claim when she opposes an unlawful employment practice for which she holds a good faith, reasonable basis to believe is unlawful. *See, e.g., Harris v. Fla. Agency for Health Care Admin.*, 611 F. App'x 949,

951 (11th Cir. 2015) (per curiam); *Diamond*, 457 F. App'x at 845–46; *Bryant v. U.S. Steel Corp.*, 428 F. App'x 895, 898 (11th Cir. 2011) (per curiam). As such, this argument is unpersuasive.

Accordingly, even when viewing all factual inferences in the light most favorable to Plaintiff, Plaintiff fails to demonstrate that her belief that Defendants engaged in an unlawful employment practice was objectively reasonable. As Plaintiff's belief was not objectively reasonable, the first prong of her *prima facie* case fails, and the Motion is due to be granted. As no genuine issue of material fact exists, Defendants are entitled to judgment in their favor as a matter of law.[12]

## IV.  CONCLUSION

Accordingly, it is **ORDERED**:

1.  Defendants' Motion for Summary Judgment, Doc. 14, is **GRANTED**.

2.  The Clerk is directed to enter **JUDGMENT** in favor of Defendants Family Practice and Injury Center, Inc. and Nila Allen.

3.  The Clerk is further directed to terminate all pending motions and close this case.

**DONE AND ORDERED** in Tampa, Florida on February 3, 2020.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any

---

[12] Having so concluded, the Court need not address the remainder of the analysis under the *McDonnell Douglas* burden-shifting framework.